UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
CHRISTINE HINES, MARY O'CONNOR,           )
and JESSICA LEPORACCI                     )
                                          )
            Plaintiffs,                   )
                                          )
      v.                                  )        CIVIL ACTION NO.
                                          )        1:08-CV-11653-PBS
                                          )
LONGWOOD EVENTS, INC.,                    )
STATE ROOM, INC.,                         )
BELLE MER, INC., and                      )
JAMES APTEKER,                            )
                                          )
            Defendants.                   )
_____)

**MEMORANDUM AND ORDER**

June 23, 2010

Saris, U.S.D.J.

**I.  INTRODUCTION**

      Plaintiffs Christine Hines, Mary O'Connor, and Jessica
Leporacci have filed this suit against their employers seeking
overtime payments under the Fair Labor Standards Act ("FLSA"), 29
U.S.C. §§ 201-219, and Massachusetts and Rhode Island law.
Defendants Longwood Events, Inc. ("Longwood"), State Room, Inc.
("State Room"), Belle Mer, Inc. ("Belle Mer"), and James Apteker,
argue that plaintiffs were exempt from the FLSA's overtime
provisions and have counterclaimed against Hines for abuse of
process under Massachusetts law.  Defendants have filed a Motion
for Summary Judgment on the plaintiffs' FLSA claims, and Hines

1

has filed a separate Motion for Summary Judgment on defendants'
counterclaim.  After hearing and review of the record, the Court
**ALLOWS** defendants' motion and **DENIES** plaintiff Hines' motion.

## II.  BACKGROUND

With all reasonable inferences drawn in favor of the non-
moving parties, the record contains the following facts, which,
unless otherwise noted, are undisputed.

### A.    The Defendants

Defendant James Apteker is the founder and president of
Longwood Events, Inc., State Room, Inc., and Belle Mer, Inc..
(Apteker Aff. ¶ 1.)  Defendants State Room and Belle Mer are
event venues located in Boston and Newport, Rhode Island,
respectively, that host high-end wedding receptions and other
social functions.  (Linneken Dep. 56:11-23, 61:17-63:4; Verge
Dep. 76:11-16.)  Defendant Longwood Events ("Longwood") is a
Massachusetts company that performs routine accounting and record
keeping functions for State Room in exchange for a fee.
(Linneken Dep. 28:22-29:21.)  Plaintiffs claim that Longwood is
the parent company of State Street and Belle Mer and that the
companies share common management.  (Gullins Aff. ¶¶ 20, 21.)

### B.    The Plaintiffs

#### 1.    Hines

Plaintiff Hines worked for as a sales manager at State Room
from February 2006 to April 2008, where she received an annual

salary of $77,000, or approximately $1,480 per week.  (Hines Dep.
83:5-84:18.)  As the manager of State Room's nonprofit sector
operations, Hines was State Room's second-highest paid sales
manager, after Susan Verge, the company's Director of Sales and
Marketing.  (Apteker Aff. ¶ 2.)  On her resume, she describes her
job functions as follows:

> **Longwood Events**
> **Director, Non-Profit Sales**
> **State Room, Boston, MA**
> Successfully manage a $4 million dollar account
> specifically geared towards the not-for-profit market
> segment.
> - Serve as the non-profit program manager
> - Work closely with non-profit board committees in
>   researching, designing and executing events.
> - Promote mission awareness of not-for-profit
>   organizations through creative marketing and
>   design.
> - Participate in board meetings.
> - Create unique events within budgetary guidelines
>   while providing a truly one of a kind experience.
> - Negotiate contracts with vendors, internal
>   and external clients.
> - Maintain and solidify long term relationships
>   with clients and vendors.
> - Consistently provide unparalleled client
>   support and relationship management.

(Defs.' Ex. F.)  Her March 1, 2007, performance review also
described her responsibilities:

> Chrissie is currently in charge of the Non Profit and
> Political Market Segment and a portion of the Corporate
> Segment, as well as having some involvement with the
> Artistry opening.  Chrissie is responsible for the
> complete customer journey from touring to contracting
> and event execution/detailing beginning to end.
> Chrissie is in charge of all aspects of business
> development for her assigned Market segments at State
> Room.

(Defs.' Ex. I ¶ 1.)

### 2.   <u>O'Connor</u>

Plaintiff O'Connor worked for Belle Mer from February 2007 to June 2008 as a sales manager at an annual salary of $48,000, or approximately $923 per week.  (O'Connor Dep. 19:24-21:10.) O'Connor negotiated her salary from defendants' initial offer of $32,000 to a base salary of $48,000, which she described as "a great job in Newport."  (<u>Id.</u> at 18:21-21:10, 54:21-22.)  Her resume reads:

> **Belle Mer** - Newport, RI
> **Sales Manager**
> Successfully sold 2.8 million dollars in first year.
> Responsible for fielding inquiry calls, booking tours
> and then turned 70% of touring customers into actual
> events.
> Worked with customers through detailing process to
> ensure customer satisfaction.  Coordinated and attended
> marketing events to promote Belle Mer to corporate and
> social businesses.
> Made cold calls to companies throughout the New England
> area to promote off season and week day business.

(Defs.' Ex. H.)  Her June 2, 2007, evaluation indicated that she was "responsible for touring as well as detailing and running the events for her files at Belle Mer. . . . [S]he does Menu Planning and Detailing and really needs to focus in on this area first and foremost over selling as this path . . . will help her to sell better in the future."  (<u>Id.</u>, Ex. J ¶ 1.)  O'Connor herself explained that "[s]oup to nuts is what I was doing back then. You didn't have any events managers.  You ran the whole thing." (O'Connor Dep. 69:3-5.)

### 3.   <u>Leporacci</u>

4

Plaintiff Jessica Leporacci worked first for Belle Mer for a few months in the fall of 2006 before moving to State Room, where she worked until August 2008.  Her salary began at $28,000, or approximately $538 per week, and rising ultimately to $36,000, or approximately $692 per week.  (Leporacci Tr. 44:9-46:17; Defs.' Ex. M.)  According to her resume, her responsibilities included:

> LONGWOOD EVENTS: STATE ROOM, Boston, MA
> Events Manager, Sales Associate, reporting to Director of Sales and Marketing
> * Assisted in planning and executing the largest Democratic Fundraiser ever in Boston, MA for Presidential candidate Barack Obama
> * Administered events for highly visible/high profile clients such as Barack Obama, John Kerry, Harry Conick Junior, Dick Wolfe, Hillary Clinton, Nordstrom and Harvard University
> * Responsible for sales, planning, on-site coordination and execution of multiple high end corporate dinners, galas, awards, non-profit, meeting, weddings and social events.  Consistently acknowledged for unparalleled client support and relationship management.
> * Oversaw events with guest counts reading 850 while managing a staff of 70 including culinary, operations and stage management teams.
> * Arrange, create and manage all aspects of events including venue selection, staffing, audio-visual production, floral, linen, entertainment, lighting, menus, transportation, photography, and other related details.
> * Implement and ensure adherence to all timeliness, deadlines and logistical details of the event.
> * Build cost-effective relationships and negotiate with all vendors.  Produce client invoices, collect receivables, and manage all event budgets.
> * Liaise between all departments to ensure proper communications and reporting practices related to large events.
> * Conceptualized, designed and implemented large scale production events at various price points to meet client needs.

(Defs.' Ex. G.)  All three plaintiffs received sales commissions pursuant to a company incentives plan, which they characterize as de minimis.  (Defs.' Ex. O.)

## C.   Plaintiffs' Responsibilities as Sales Managers

Sales managers are defendants' primary client contacts. (Linneken Dep. 73:6-12.)  They are responsible for bringing in revenue and soliciting business through cold calling lists of clients provided by defendants or working with those who contact a venue on their own initiative.  (O'Connor Dep. 34:10-35:23; Gullins Aff. ¶ 15.)  They meet with clients to assess their requirements for an event and to convince them to use the defendants' venues.  (Leporacci Dep. 43:2-44:8, 54:2-56:4; O'Connor Dep. 26:8-29:23, 50:19-51:1.)  Defendants expect sales managers to work according to guidelines set forth in Longwood's Events Sales Handbook, which includes such advice as "Do not provide discounts . . . without Sales Director approval," "make sure the menu fits the event," and "[b]e creative in booking - do not turn anything away."  (Pls.' Ex. 6 at 5-7.)  Plaintiffs concede, however, that while they operated within established guidelines, they used no prepared scripts in their client interactions.[1]  (O'Connor Dep. 27:14-17; Leporacci Dep. 20:7-13,

---

[1] Defendants did create one "scripted" stock answer to a specific client question about a venue the company abandoned, but did not do so with regard to the sales managers' daily work soliciting business for the State Street and Belle Mer venues. (Pls.' Ex. 6 at 1.)

21:5-17.)

Once they convince a client to host an event at one of the defendants' venues, sales managers complete and execute a contract with a superior's approval.  (O'Connor Dep. 27:4-7, 28:11-30:3; Leporacci Dep. 41:24-44:2; Verge Dep. 159:6-13; Linneken Dep. 149:9-24; Gullins Aff. ¶¶ 12-14.)  Defendants require sales managers to use a process called "yielding" to weigh multiple variables in pricing an event, including demand for the venue, a client's budget, the menu, and other services provided, the goal of which was to "yield" more revenue for each event.  (Linneken Dep. 77:6-82:8; Verge Dep. 112:14-121:15.)  The contracts were form agreements and consisted of selecting from an array of pre-priced variables (e.g., menu, time, and other services) to suit the client's specifications.  (O'Connor Dep. 27:16-28:17; Verge Dep. 127:5-19, 238:5-11, 288:2-20, 297:6-13; Linneken Dep. 155:18-156:1; Gullins Aff. ¶¶ 12-14, 19; Pls.' Ex. 6.)  Once the contracts are approved by their supervisors, sales managers execute them on defendants' behalf.  (Hines Dep. 50:17-20; Verge Dep. 167:18-21; Linneken Dep. 63:14-64:13, 145:10-16.)

After finalizing a contract, sales managers work closely with clients to plan the details and execution of an event, managing client expectations and reporting problems to management.  (Verge Dep. 58:15-61:5, 266:13-267:21; Hines Dep. 51:1-4; Leporacci Dep. 88:15-89:18.)  They work and coordinate with a variety of vendors and internal staff in the planning

process, and sometimes attend an event personally to ensure its
success.  (Hines Dep. 121:5-123:16; O'Connor Dep. 23:3-25:15,
61:10-62:6.)

D.    **The Present Dispute**

The present dispute arose when defendants denied the
plaintiffs' requests for overtime pay.  Plaintiffs allege that
defendants classified them improperly as exempt from the FLSA's
overtime requirement.  Hines filed a Wage and Hour Complaint with
the Massachusetts Attorney General's Office and was granted leave
to file a civil action.  Defendants filed a counterclaim against
Hines for abuse of process under Massachusetts law, arguing that
her FLSA claim is merely an attempt to extort severance pay that
State Room denied upon her resignation.  The company has a policy
of not paying severance to employees who quit.  Apteker testified
that, after being denied severance pay, Hines mumbled she would
"find a way" to get it.  (Apteker Dep. 126:8-11.)  He conceded in
his deposition, though, that he "[didn't] know if she mumbled it
under her breath or something, but she made a comment because I
knew right away after I said she's going after us."  Id. at
127:2-5.)  When pressed further, he said that "she gave me a look
and mumbled something under her breath.  I don't know exactly
what was said, but the impression I got was she was coming after
us.  Something is up her sleeve."  (Id. at 128:13-17.)  Hines now
moves for summary judgment on the abuse of process claim.  Hines

8

has also filed a retaliation counterclaim in her answer to
defendants' abuse of process claim, upon which neither party has
moved for summary judgment.  (Docket No. 54 at 2-3.)

### III.  LEGAL STANDARD

"Summary judgment is appropriate when 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.'"  Barbour v.
Dynamics Research Corp., 63 F.3d 32, 36-37 (1st Cir. 1995)
(quoting Fed. R. Civ. P. 56(c)).  To succeed on a motion for
summary judgment, "the moving party must show that there is an
absence of evidence to support the nonmoving party's position.
Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also
Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made such a showing, "the burden
shifts to the non-moving party, who 'may not rest on mere
allegations or denials of his pleading, but must set forth
specific facts showing there is a genuine issue for trial.'"
Barbour, 63 F.3d at 37 (quoting Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 256 (1986)).  The non-moving party must establish
that there is "sufficient evidence favoring [its position] for a
jury to return a verdict [in its favor].  If the evidence is
merely colorable or is not significantly probative, summary

judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted).  The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." <u>Barbour</u>, 63 F.3d at 36 (citation omitted).

## IV.   DISCUSSION

### A.   <u>Plaintiffs' FLSA Claims</u>

#### 1.   <u>The FLSA Regulatory Framework</u>

The FLSA establishes a general rule that employers compensate each employee at "a rate not less than one and one-half times the 'regular rate' for all overtime hours than an employee works," defined as all hours in excess of a forty hour workweek.  29 U.S.C. § 207(a)(1).  The statute exempts from this requirement, however, "any employee employed in a bona fide executive, administrative, or professional capacity . . . ." <u>Id.</u> § 213(a)(1).  An employer bears the burden of proving that an employee falls within the scope of an exemption. <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 7 (1st Cir. 1997). Additionally, "the remedial nature of the statute requires that [its] exemptions be narrowly construed against the employers seeking to assert them" and "limited to those establishments plainly and unmistakably within [the exemptions'] terms and spirit." <u>Id.</u> (quoting <u>Arnold v. Ben Kanowsky, Inc.</u>, 361 U.S. 388, 392 (1960)).

The Secretary of Labor has promulgated regulations specifying the scope of the administrative employee exemption. See 29 C.F.R. § 541.  "Although the regulations merely state the Secretary's official position on how the statutes should be interpreted, a court must give them controlling weight unless [it finds them] to be arbitrary, capricious, or contrary to the statute."  Cash v. Cycle Craft Co., 508 F.3d 680, 683 (1st Cir. 2007) (citing John Alden, 126 F.3d at 8).  The regulations establish a "short test," applying the administrative employee exemption to employees who meet the following conditions:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities.
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  Plaintiffs acknowledge that they meet the first two requirements.  (Pls.' Opp. Mot. Summ. J. 4.)  The only dispute is whether they exercised "discretion and independent judgment with respect to matters of significance."

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. §

541.202(a); see also De Jesus-Rentas v. Baxter Pharm. Servs.
Corp., 400 F.3d 72, 74-75 & n.4 (1st Cir. 2005).  "The term
'matters of significance' refers to the level of importance or
consequence of the work performed."  29 C.F.R. § 541.202(a).  The
regulations list the following non-exhaustive factors, which the
Court may consider in light of all relevant facts to determine
whether plaintiffs exercised discretion and independent judgment:

> [1] whether the employee has authority to formulate,
> affect, interpret, or implement management policies or
> operating practices; [2] whether the employee carries
> out major assignments in conducting the operations of
> the business; [3] whether the employee performs work
> that affects business operations to a substantial
> degree, even if the employee's assignments are related
> to operation of a particular segment of the business;
> [4] whether the employee has authority to commit the
> employer in matters that have significant financial
> impact; [5] whether the employee has authority to waive
> or deviate from established policies and procedures
> without prior approval; [6] whether the employee has
> authority to negotiate and bind the company on
> significant matters; [7] whether the employee provides
> consultation or expert advice to management; [8]
> whether the employee is involved in planning long- or
> short-term business objectives; [9] whether the
> employee investigates and resolves matters of
> significance on behalf of management; and [10] whether
> the employee represents the company in handling
> complaints, arbitrating disputes or resolving
> grievances.

Id. § 541.202(b).  The regulations also provide examples of
employees who generally meet the duties requirements for the
administrative exemption, including the following:

> An employee who leads a team of other employees
> assigned to complete major projects for the employer
> (such as purchasing, selling or closing all or part of
> the business, negotiating a real estate transaction or
> a collective bargaining agreement, or designing and

implementing productivity improvements) . . . even if
the employee does not have direct supervisory
responsibility over the other employees on the team.

Id. § 541.203(c).

"Other factors which federal courts have found relevant
include . . . freedom from direct supervision . . . use of
personalized communication techniques, primary contact to public
or customers on behalf of the employer . . . advertising or
promotion work, and coordination of departments, requirements, or
other activities for or on behalf of employer . . . ."  Defining
and Delimiting the Exemptions for Executive, Administrative,
Professional, Outside Sales and Computer Employees, 69 Fed. Reg.
22,122, 22,144 (Apr. 23, 2004) (collecting cases).  "Federal
courts generally find that employees who meet at least two or
three of these factors are exercising discretion and independent
judgment, although a case-by-case analysis is required."  Id. at
22,143.

The fact that an employee is supervised or subject to review
and reversal does not preclude the exercise of discretion and
independent judgment, nor does the fact that she consults a
manual or guidelines.  29 C.F.R. § 541.202(c); Cheatham v.
Allstate Ins. Co., 465 F.3d 578, 585 (5th Cir. 2006); John Alden,
126 F.3d at 13 (quoting Dymond v. U.S. Postal Serv., 670 F.2d 93,
96 (8th Cir. 1982)).  However, "[t]he exercise of discretion and
independent judgment must be more than the use of skill in
applying well-established techniques, procedures or specific

standards described in manuals or other sources."   29 C.F.R. §
541.202(e).

    2.   **Application to Plaintiffs**

    Defendants claim that plaintiffs exercised discretion and
independent judgment in identifying potential clients to solicit
from among the lists provided by defendants, assessing client
needs to "pitch" the venues effectively, negotiating contracts,
working with clients to design a unique event tailored to their
needs, and coordinating with staff and vendors to implement those
programs.   Plaintiffs argue that their work with regard to all of
these activities was carefully and specifically governed by
company policies and that they retained little decision making
authority independent of their supervisors.   The facts regarding
plaintiffs' daily responsibilities, as well as the inferences
drawn from those facts, are questions of fact, while the ultimate
conclusion regarding their entitlement to overtime pay is one of
law.   See Holzapfel v. Town of Newburgh, 145 F.3d 516 (2d Cir.
1998) (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709,
714 (1986)).   The parties agree that the outcome as to this
question should be the same for all three plaintiffs.

    The key case in this circuit is Cash v. Cycle Craft Co., 508
F.3d 680 (1st Cir. 2007).   There, the plaintiff worked for the
Boston Harley motorcycle store as a "New Purchase/Customer
Relations Manager," a position he had helped design.   508 F.3d at

14

681.  Although the job description included developing an

"overall Customer Service strategic plan" and required five years

experience in "'Customer Service Management' and 'as a

Supervisor,'" Cash's actual responsibilities differed.  Id. at

681-82.

> His duties included working with various . . .
> departments to make sure that they outfitted and
> delivered each motorcycle according to the particular
> purchase order.  If ordered parts were not installed,
> he was to contact the service manager . . . and tell
> him what needed to be done.  Once problems were
> resolved, Cash was to tell the finance department that
> the motorcycle was ready. . . . Cash then tracked the
> purchased motorcycles; it was his job to stay in touch
> with the customers and make sure that they were
> satisfied . . . .

Id. at 682.

In affirming the district court's conclusion that Cash fell

within the administrative exemption, the First Circuit did not

consider the broad strategic planning responsibilities outlined

in his job description, but rather his actual duties.  The court

reasoned that he "was 'engaged in something more than routine

selling efforts focused simply on particular sales transactions'

. . . . Rather, he focused on improving customer service

generally, by coordinating with various . . . departments to

ensure that customers were satisfied with their purchase and that

they would provide . . . positive feedback reports."  Id. at 686

(quoting Reich v. John Alden Life Ins. Co., 126 F.3d 1, 10 (1st

Cir. 1997)).  The court also cited his salary, which was "greater

or equal to that of all the other managers" except the general

manager and his "attendance at management meetings, albeit in a limited fashion . . . ." Id.

Another instructive case is Reich v. John Alden Life Insurance Co., which involved an insurer's marketing representatives, whose job was to "cultivate [an] independent agent sales force" to market John Alden's products along with those of its competitors. 126 F.3d at 3. "In dealing with agents, the marketing representatives do not use prepared scripts. Further, although they receive guidance about suggested points of emphasis during an initial training period and at weekly sales meetings, these employees must decide for themselves which products to emphasize to a particular agent . . . ." Id. at 4. However, they have no authority to approve or deny applications once submitted. Id.

In affirming the district court's ruling that the marketing representatives fell within the exemption, the First Circuit noted that they "[1] have discretion in choosing which agents to contact . . . and concerning which products to discuss with each agent. . . . [2] rely on their own knowledge of an agent's business to help tailor proposals . . . . [and 3] and distinguish John Alden's offerings from those of competitors." Id. at 13. The court rejected the argument that the employees were "simply making decisions within a given set of parameters," reasoning that "the content of a given conversation with an agent is dictated by the needs . . . of that agent" and that, to the

16

extent they did adhere to predetermined guidelines, the marketing representatives still exercised discretion in applying them to meet the needs of individual customers.  Id. at 14 (citing Atlanta Prof. Firefighters Union, Local 134 v. City of Atlanta, 920 F.2d 800, 805 (11th Cir. 1991).

Cash and John Alden weigh strongly in defendants' favor.  In the instant case, the sales managers' primary duty was convincing clients to book events at the defendants' venues.  They had to respond to individualized client concerns, answer questions while touring the properties with clients, and determine how best to "pitch" the venues.  It is undisputed that they did so with guidance from an employee handbook and a scripted response to one client question.  However, like the plaintiffs in John Alden, their conversations with each prospective client were dictated not by scripts mandated by defendants, but rather by the specific needs of individual customers as gleaned by the sales manager. See John Alden, 126 F.3d at 3, 13; In re Novartis Wage & Hour Litig., 593 F. Supp. 2d 637, 641-42, 657 (S.D.N.Y. 2009) (granting summary judgment against pharmaceutical sales reps whose employer "prepared scripts and related materials" to use when detailing physicians because they must still "be capable of tailoring their presentation to a given timeframe - deciding how best to convey the 'core message' in a manner that will have the desired effect on the physician").

17

Plaintiffs prepared personalized events for defendants'
clients.  Throughout this process, they act as the primary
conduit between defendants and their clients, often coordinating
with various departments and external vendors to ensure customer
satisfaction and sometimes attending events to ensure that they
went smoothly.  While plaintiffs had only preestablished product
and price offerings at their disposal, they determined for
themselves how best to fit those options to the needs of each
individual client.  The fact that their proposals were subject to
review and approval, or that they did not have direct supervisory
authority over other employees, is not dispositive under the
regulations.  29 C.F.R. §§ 541.202(c), 541.203(c).  These efforts
constituted major assignments undertaken by the sales managers,
affecting a substantial portion of defendants' business.[2]

Conversely, plaintiffs have shown a disputed question of
fact as to many of the factors listed in the regulations.
Relying in particular on the affidavit of Jennifer Gullins, a
former employee of defendants, they have presented evidence that
(1) they had no role in shaping management policies; (2) they had
little ability to "negotiate" contracts or obligate the
defendants financially without supervisory approval; (3) they

---

[2] The parties dispute the percentage of sales for which each
plaintiff was responsible due to defendants' failure to disclose
their overall revenues, but it is undisputed that plaintiffs were
each responsible for substantial business, totaling millions of
dollars in revenue.

could not deviate from defendants' established policies; and (4) they exercised no discretion in selecting prospective clients to approach.  Those factors, however, are not dispositive.

While it is the employer's burden to establish the applicability of an exemption, which must be construed narrowly against them, defendants need not win every point to prevail. Here, plaintiffs were engaged not merely in the sale of a product, but assessed individual client needs to determine how best to sell defendants' venues and worked with customers to design a customized event based on those needs.  As their resumes highlight, each carried out major assignments in conducting the operations of the business, and the work affected the business operations to a substantial degree.  <u>See</u> 29 C.F.R. § 541.202(b). The fact that plaintiffs exercised no systemic role in shaping customer service policies or setting prices does not change the undisputed evidence that they exercised discretion and independent judgment in determining how to assemble an event to suit each client's taste.

**B.    <u>Defendants' Abuse of Process Counterclaim</u>**

Defendants counterclaim against plaintiff Hines for abuse of process under Massachusetts law, claiming that Hines filed the underlying FLSA claim for the ulterior purpose of extracting monetary and other concessions after she was denied severance pay.  Hines now moves for summary judgment on that claim, which

defendants oppose on the basis of a disputed statement going to
her allegedly ulterior purpose.

"To prevail on an abuse of process claim it must appear that
the process was used to accomplish some ulterior purpose for
which it was not designed or intended, or which was not the
legitimate purpose of the particular process employed. . . . The
essential elements of the tort are (1) "process" was used; (2)
for an ulterior or illegitimate purpose; (3) resulting in
damage." Datacomm Interface, Inc. v. Computerworld, Inc., 396
Mass. 760, 775-76, 489 N.E.2d 185, 195 (1986) (citations
omitted). Hines argues that defendants cannot prove the second
element of the tort, namely, that she brought her FLSA suit for
an ulterior or illegitimate purpose. Defendants argue that,
based on her statement to Apteker that she would "find a way to
get it," referring to the severance she was denied, there is a
genuine issue of fact as to her motive in bringing the present
suit. (Apteker Dep. 125:13-127:7.)

Where a party's state of mind in bringing an action is in
dispute, summary judgment is inappropriate. Vittands v. Sudduth,
49 Mass. App. Ct. 401, 407-08; 730 N.E.2d 325, 333 (2000); see
also Hutchins v. Cardiac Sci., Inc., 491 F. Supp. 2d 136, 141 (D.
Mass. 2007) (denying summary judgment on abuse of process claim
in light of circumstantial evidence of ulterior motive). Here,
plaintiff points out that there was substantial evidence in her
favor concerning some of the regulatory factors relevant to

20

evaluating the underlying FLSA claim.  Defendants are correct, however, that the merits of the underlying action are not dispositive.  <u>See</u> <u>Fishman v. Brooks</u>, 396 Mass. 643, 652, 487 N.E.2d 1377, 1383 (1986) ("Proof of the groundlessness of an action is not an essential element for an action for abuse of process."); <u>Kelley v. Stop & Shop Co.</u>, 26 Mass. App. Ct. 557, 558, 530 N.E.2d 190, 191 (1988) ("'It is immaterial that the process was properly issued, that it was obtained in the course of proceedings that were brought with probable cause and for a proper purpose, or even that the proceedings terminated in favor of the person . . . initiating them.'" (quoting Restatement (Second) of Torts § 682 comment a (1977))).  The flaw in defendants' case is Apteker's lack of certainty as to plaintiff's precise statement, which she mumbled after he refused severance pay.  However, when all reasonable inferences are drawn in defendants' favor, there is a disputed issue of fact whether plaintiff brought the suit for the illegitimate purpose of extracting a severance package or the legitimate purpose of recouping the overtime pay she believed was her due.

## ORDER

Defendants' Motion for Summary Judgment on the FLSA claims [Docket No. 66] is **<u>ALLOWED</u>**.  Plaintiff Hines' Motion for Summary Judgment on the abuse of process claim [Docket No. 61] is **<u>DENIED</u>**. Neither side has moved for summary judgment on the claim that the

counterclaim was brought to retaliate against plaintiff for
filing the FLSA claim.  The case is referred to a mediator to
settle these two remaining claims.

/s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge